(Slip Opinion) OCTOBER TERM, 2007 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GILES *v.* CALIFORNIA

### CERTIORARI TO THE SUPREME COURT OF CALIFORNIA

No. 07–6053.   Argued April 22, 2008—Decided June 25, 2008

At petitioner Giles' murder trial, the court allowed prosecutors to intro-
duce statements that the murder victim had made to a police officer
responding to a domestic violence call.  Giles was convicted.  While
his appeal was pending, this Court held that the Sixth Amendment's
Confrontation Clause gives defendants the right to cross-examine
witnesses who give testimony against them, except in cases where an
exception to the confrontation right was recognized at the founding.
*Crawford* v. *Washington*, 541 U. S. 36, 53–54.  The State Court of
Appeal concluded that the Confrontation Clause permitted the trial
court to admit into evidence the unconfronted testimony of the mur-
der victim under a doctrine of forfeiture by wrongdoing.  It concluded
that Giles had forfeited his right to confront the victim's testimony
because it found Giles had committed the murder for which he was
on trial—an intentional criminal act that made the victim unavail-
able to testify.  The State Supreme Court affirmed on the same
ground.

*Held:* The California Supreme Court's theory of forfeiture by wrongdo-
ing is not an exception to the Sixth Amendment's confrontation re-
quirement because it was not an exception established at the found-
ing.  Pp. 3–20; 22–24.

  (a) Common-law courts allowed the introduction of statements by
an absent witness who was "detained" or "kept away" by "means or
procurement" of the defendant.  Cases and treatises indicate that this
rule applied only when the defendant engaged in conduct *designed* to
prevent the witness from testifying.  Pp. 4–7.

  (b) The manner in which this forfeiture rule was applied makes
plain that unconfronted testimony would not be admitted without a
showing that the defendant intended to prevent a witness from testi-
fying.  In cases where the evidence suggested that the defendant

wrongfully caused the absence of a witness, but had not done so to prevent the witness from testifying, unconfronted testimony was excluded unless it fell within the separate common-law exception to the confrontation requirement for statements made by speakers who were both on the brink of death and aware that they were dying. Pp. 7–11.

(c) Not only was California's proposed exception to the confrontation right plainly not an "exceptio[n] established at the time of the founding," *Crawford, supra,* at 54; it is not established in American jurisprudence since the founding. No case before 1985 applied forfeiture to admit statements outside the context of conduct designed to prevent a witness from testifying. The view that the exception applies only when the defendant intends to make a witness unavailable is also supported by modern authorities, such as Federal Rule of Evidence 804(b)(6), which "codifies the forfeiture doctrine," *Davis* v. *Washington,* 547 U. S 813, 833. Pp. 11–14.

(d) The dissent's contention that no testimony would come in at common law under a forfeiture theory unless it was confronted is not supported by the cases. In any event, if the dissent's theory were true, it would not support a broader forfeiture exception but would eliminate the forfeiture exception entirely. Previously confronted testimony by an unavailable witness is always admissible, wrongful procurement or not. See *Crawford*, *supra*, at 68. Pp. 15–20.

(e) Acts of domestic violence are often intended to dissuade a victim from resorting to outside help. A defendant's prior abuse, or threats of abuse, intended to dissuade a victim from resorting to outside help would be highly relevant to determining the intent of a defendant's subsequent act causing the witness's absence, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify. Here, the state courts did not consider Giles' intent, which they found irrelevant under their interpretation of the forfeiture doctrine. They are free to consider intent on remand. Pp. 23–24.

40 Cal. 4th 833, 152 P. 3d 433, vacated and remanded.

SCALIA, J., delivered the opinion of the Court, except as to Part II–D–2. ROBERTS, C. J., and THOMAS and ALITO, JJ., joined that opinion in full, and SOUTER and GINSBURG, JJ., joined as to all but Part II–D–2. THOMAS, J., and ALITO, J., filed concurring opinions. SOUTER, J., filed an opinion concurring in part, in which GINSBURG, J., joined. BREYER, J., filed a dissenting opinion, in which STEVENS and KENNEDY, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–6053

## DWAYNE GILES, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF CALIFORNIA

[June 25, 2008]

JUSTICE SCALIA delivered the opinion of the Court, except as to Part II–D–2.

We consider whether a defendant forfeits his Sixth Amendment right to confront a witness against him when a judge determines that a wrongful act by the defendant made the witness unavailable to testify at trial.

## I

On September 29, 2002, petitioner Dwayne Giles shot his ex-girlfriend, Brenda Avie, outside the garage of his grandmother's house.  No witness saw the shooting, but Giles' niece heard what transpired from inside the house.  She heard Giles and Avie speaking in conversational tones.  Avie then yelled "Granny" several times and a series of gunshots sounded.  Giles' niece and grandmother ran outside and saw Giles standing near Avie with a gun in his hand.  Avie, who had not been carrying a weapon, had been shot six times.  One wound was consistent with Avie's holding her hand up at the time she was shot, another was consistent with her having turned to her side, and a third was consistent with her having been shot while lying on the ground.  Giles fled the scene after the shooting.  He was apprehended by police about two weeks

later and charged with murder.

At trial, Giles testified that he had acted in self-defense. Giles described Avie as jealous, and said he knew that she had once shot a man, that he had seen her threaten people with a knife, and that she had vandalized his home and car on prior occasions. He said that on the day of the shooting, Avie came to his grandmother's house and threatened to kill him and his new girlfriend, who had been at the house earlier. He said that Avie had also threatened to kill his new girlfriend when Giles and Avie spoke on the phone earlier that day. Giles testified that after Avie threatened him at the house, he went into the garage and retrieved a gun, took the safety off, and started walking toward the back door of the house. He said that Avie charged at him, and that he was afraid she had something in her hand. According to Giles, he closed his eyes and fired several shots, but did not intend to kill Avie.

Prosecutors sought to introduce statements that Avie had made to a police officer responding to a domestic-violence report about three weeks before the shooting. Avie, who was crying when she spoke, told the officer that Giles had accused her of having an affair, and that after the two began to argue, Giles grabbed her by the shirt, lifted her off the floor, and began to choke her. According to Avie, when she broke free and fell to the floor, Giles punched her in the face and head, and after she broke free again, he opened a folding knife, held it about three feet away from her, and threatened to kill her if he found her cheating on him. Over Giles' objection, the trial court admitted these statements into evidence under a provision of California law that permits admission of out-of-court statements describing the infliction or threat of physical injury on a declarant when the declarant is unavailable to testify at trial and the prior statements are deemed trustworthy. Cal. Evid. Code Ann. §1370 (West Supp. 2008).

A jury convicted Giles of first-degree murder. He appealed. While his appeal was pending, this Court decided in *Crawford* v. *Washington*, 541 U. S. 36, 53–54 (2004), that the Confrontation Clause requires that a defendant have the opportunity to confront the witnesses who give testimony against him, except in cases where an exception to the confrontation right was recognized at the time of the founding. The California Court of Appeal held that the admission of Avie's unconfronted statements at Giles' trial did not violate the Confrontation Clause as construed by *Crawford* because *Crawford* recognized a doctrine of forfeiture by wrongdoing. 19 Cal. Rptr. 3d 843, 847 (2004) (officially depublished). It concluded that Giles had forfeited his right to confront Avie because he had committed the murder for which he was on trial, and because his intentional criminal act made Avie unavailable to testify. The California Supreme Court affirmed on the same ground. 40 Cal. 4th 833, 837, 152 P. 3d 433, 435 (2007). We granted certiorari. 552 U. S. \_\_\_ (2008).

## II

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him. *Crawford,* 541 U. S., at 68. The State does not dispute here, and we accept without deciding, that Avie's statements accusing Giles of assault were testimonial. But it maintains (as did the California Supreme Court) that the Sixth Amendment did not prohibit prosecutors from introducing the statements because an exception to the confrontation guarantee permits the use

of a witness's unconfronted testimony if a judge finds, as the judge did in this case, that the defendant committed a wrongful act that rendered the witness unavailable to testify at trial. We held in *Crawford* that the Confrontation Clause is "most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." *Id.*, at 54. We therefore ask whether the theory of forfeiture by wrongdoing accepted by the California Supreme Court is a founding-era exception to the confrontation right.

## A

We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. See *id.*, at 56, n. 6, 62. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying. See, *e.g.*, *King* v. *Woodcock,* 1 Leach 500, 501–504, 168 Eng. Rep. 352, 353–354 (1789); *State* v. *Moody*, 3 N. C. 31 (Super. L. & Eq. 1798); *United States* v. *Veitch*, 28 F. Cas. 367, 367–368 (No. 16,614) (CC DC 1803); *King* v. *Commonwealth*, 4 Va. 78, 80–81 (Gen. Ct. 1817). Avie did not make the unconfronted statements admitted at Giles' trial when she was dying, so her statements do not fall within this historic exception.

A second common-law doctrine, which we will refer to as forfeiture by wrongdoing, permitted the introduction of statements of a witness who was "detained" or "kept away" by the "means or procurement" of the defendant. See, *e.g.*, *Lord Morley's Case*, 6 How. St. Tr. 769, 771 (H. L. 1666) ("detained"); *Harrison's Case*, 12 How. St. Tr. 833, 851 (H. L. 1692) ("made him keep away"); *Queen* v. *Scaife,* 117 Q. B. 238, 242, 117 Eng. Rep. 1271, 1273 (K. B. 1851) ("kept away"); see also 2 W. Hawkins, Pleas of the Crown 425 (4th ed. 1762) (hereinafter Hawkins) (same); T. Peake,

Compendium of the Law of Evidence 62 (2d ed. 1804) ("sent" away); 1 G. Gilbert, Law of Evidence 214 (1791) ("detained and kept back from appearing by the means and procurement of the prisoner"). The doctrine has roots in the 1666 decision in *Lord Morley's Case*, at which judges concluded that a witness's having been "detained by the means or procurement of the prisoner," provided a basis to read testimony previously given at a coroner's inquest. 6 How. St. Tr., at 770–771. Courts and commentators also concluded that wrongful procurement of a witness's absence was among the grounds for admission of statements made at bail and committal hearings conducted under the Marian statutes, which directed justices of the peace to take the statements of felony suspects and the persons bringing the suspects before the magistrate, and to certify those statements to the court, *Crawford*, *supra*, at 43–44; J. Langbein, Prosecuting Crime in the Renaissance 10–12, 16–20 (1974). See 2 Hawkins 429. This class of confronted statements was also admissible if the witness who made them was dead or unable to travel. *Ibid.*

The terms used to define the scope of the forfeiture rule suggest that the exception applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying. The rule required the witness to have been "kept back" or "detained" by "means or procurement" of the defendant. Although there are definitions of "procure" and "procurement" that would merely require that a defendant have caused the witness's absence, other definitions would limit the causality to one that was *designed* to bring about the result "procured." See 2 N. Webster, An American Dictionary of the English Language (1828) (defining "procure" as "to *contrive* and effect" (emphasis added)); *ibid.* (defining "procure" as "to get; to gain; to obtain; as by request, loan, effort, labor or purchase"); 12 Oxford English Dictionary 559 (2d ed. 1989) (def. I(3))

(defining "procure" as "[t]o contrive or devise with care (an action or proceeding); to endeavour to cause or bring about (mostly something evil) *to* or *for* a person"). Similarly, while the term "means" could sweep in all cases in which a defendant caused a witness to fail to appear, it can also connote that a defendant forfeits confrontation rights when he uses an intermediary for the purpose of making a witness absent. See 9 *id.*, at 516 ("[A] person who intercedes for another or uses influence in order to bring about a desired result"); N. Webster, An American Dictionary of the English Language 822 (1869) ("That through which, or by the help of which, an end is attained").

Cases and treatises of the time indicate that a purpose-based definition of these terms governed. A number of them said that prior testimony was admissible when a witness was kept away by the defendant's "means and contrivance." See 1 J. Chitty, A Practical Treatise on the Criminal Law 81 (1816) ("kept away by the means and contrivance of the prisoner"); S. Phillipps, A Treatise on the Law of Evidence 165 (1814) ("kept out of the way by the means and contrivance of the prisoner"); *Drayton* v. *Wells*, 10 S. C. L. 409, 411 (S. C. 1819) ("kept away by the contrivance of the opposite party"). This phrase requires that the defendant have schemed to bring about the absence from trial that he "contrived." Contrivance is commonly defined as the act of "inventing, devising or planning," 1 Webster, *supra*, at 47, "ingeniously endeavoring the accomplishment of anything," "the bringing to pass by planning, scheming, or stratagem," or "[a]daption of means to an end; design, intention," 3 Oxford English Dictionary, *supra*, at 850.[1]

---

[1] The dissent asserts that a defendant could have "contrived, *i.e.*, devised or planned . . . to murder a victim" without the purpose of keeping the victim away from trial. See *post,* at 12 (opinion of BREYER, J.). But that would not be contriving to keep the witness away. The dissent further suggests that these authorities are irrele-

An 1858 treatise made the purpose requirement more explicit still, stating that the forfeiture rule applied when a witness "had been kept out of the way by the prisoner, or by some one on the prisoner's behalf, *in order to prevent him from giving evidence against him*." E. Powell, The Practice of the Law of Evidence 166 (1st ed. 1858) (emphasis added). The wrongful-procurement exception was invoked in a manner consistent with this definition. We are aware of no case in which the exception was invoked although the defendant had not engaged in conduct designed to prevent a witness from testifying, such as offering a bribe.

## B

The manner in which the rule was applied makes plain that unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying. In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying—as in the typical murder case involving accusatorial statements by the victim—the testimony was excluded unless it was confronted or fell within the dying-declaration exception. Prosecutors do not appear to have even *argued* that the judge could admit the unconfronted statements because the defendant committed the murder for which he was on trial.

Consider *King* v. *Woodcock*. William Woodcock was accused of killing his wife, Silvia, who had been beaten

---

vant because "the relevant phrase" in *Lord Morley's Case* itself is "'by *means or* procurement'" of the defendant and means "may, *or may not*, refer to an absence that the defendant desired, as compared to an absence that the defendant caused." *Post*, at 12–13 (emphasis added). But the authorities we cited resolve this ambiguity in favor of purpose by substituting for the "means or procurement" of *Lord Morley's Case* either "contrivance" or "means *and* contrivance." (Emphasis added.)

and left near death.  A Magistrate took Silvia Woodcock's
account of the crime, under oath, and she died about 48
hours later.  The judge stated that "[g]reat as a crime of
this nature must always appear to be, yet the inquiry into
it must proceed upon the rules of evidence."  1 Leach, at
500, 168 Eng. Rep., at 352.  Aside from testimony given at
trial in the presence of the prisoner, the judge said, there
were "two other species which are admitted by law: The
one is the dying declaration of a person who has received a
fatal blow; the other is the examination of a prisoner, and
the depositions of the witnesses who may be produced
against him" taken under the Marian bail and committal
statutes.  *Id.*, at 501, 168 Eng. Rep., at 352–353 (footnote
omitted).  Silvia Woodcock's statement could not be admit-
ted pursuant to the Marian statutes because it was uncon-
fronted—the defendant had not been brought before the
examining Magistrate and "the prisoner therefore had no
opportunity of contradicting the facts it contains."  *Id.*, at
502, 168 Eng. Rep., at 353.  Thus, the statements were
admissible only if the witness "apprehended that she was
in such a state of mortality as would inevitably oblige her
soon to answer before her Maker for the truth or falsehood
of her assertions."  *Id.,* at 503, 168 Eng. Rep., at 353–354
(footnote omitted).  Depending on the account one credits,
the court either instructed the jury to consider the state-
ments only if Woodcock was "in fact under the apprehen-
sion of death," *id.*, at 504, 168 Eng. Rep., at 354, or deter-
mined for itself that Woodcock was "quietly resigned and
submitting to her fate" and admitted her statements into
evidence, 1 E. East, Pleas of the Crown 356 (1803).

  *King* v. *Dingler,* 2 Leach 561, 168 Eng. Rep. 383 (1791),
applied the same test to exclude unconfronted statements
by a murder victim.  George Dingler was charged with
killing his wife Jane, who suffered multiple stab wounds
that left her in the hospital for 12 days before she died.
The day after the stabbing, a Magistrate took Jane Din-

gler's deposition—as in *Woodcock,* under oath—"of the facts and circumstances which had attended the outrage committed upon her." 2 Leach, at 561, 168 Eng. Rep., at 383. George Dingler's attorney argued that the statements did not qualify as dying declarations and were not admissible Marian examinations because they were not taken in the presence of the prisoner, with the result that the defendant did not "have, as he is entitled to have, the benefit of cross-examination." *Id.*, at 562, 168 Eng. Rep., at 384. The prosecutor agreed, but argued the deposition should still be admitted because "it was the best evidence that the nature of the case would afford." *Id.*, at 563, 168 Eng. Rep., at 384. Relying on *Woodcock,* the court "refused to receive the examination into evidence." *Id.*, at 563, 168 Eng. Rep., at 384.

Many other cases excluded victims' statements when there was insufficient evidence that the witness was aware he was about to die. See *Thomas John's Case*, 1 East 357, 358 (P. C. 1790); *Welbourn's Case*, 1 East 358, 360 (P. C. 1792); *United States* v. *Woods*, 28 F. Cas. 762, 763 (No. 16,760) (CC DC 1834); *Lewis* v. *State*, 17 Miss. 115, 120 (1847); *Montgomery* v. *State*, 11 Ohio 424, 425–426 (1842); *Nelson* v. *State*, 26 Tenn. 542, 543 (1847); *Smith* v. *State*, 28 Tenn. 9, 23 (1848). Courts in all these cases did not even consider admitting the statements on the ground that the defendant's crime was to blame for the witness's absence—even when the evidence establishing that was overwhelming. The reporter in *Woodcock* went out of his way to comment on the strength of the case against the defendant: "The evidence, independent of the information or declarations of the deceased, was of a very pressing and urgent nature against the prisoner." 1 Leach, at 501, 168 Eng. Rep., at 352.

Similarly, in *Smith* v. *State*, *supra,* the evidence that the defendant had caused the victim's death included, but was not limited to, the defendant's having obtained arsenic

from a local doctor a few days before his wife became violently ill; the defendant's paramour testifying at trial that the defendant admitted to poisoning his wife; the defendant's having asked a physician "whether the presence of arsenic could be discovered in the human stomach a month after death"; and, the answer to that inquiry apparently not having been satisfactory, the defendant's having tried to hire a person to burn down the building containing his wife's body. *Id.*, at 10–11. If the State's reading of common law were correct, the dying declarations in these cases and others like them would have been admissible.

Judges and prosecutors also failed to invoke forfeiture as a sufficient basis to admit unconfronted statements in the cases that did apply the dying-declarations exception. This failure, too, is striking. At a murder trial, presenting evidence that the defendant was responsible for the victim's death would have been no more difficult than putting on the government's case in chief. Yet prosecutors did not attempt to obtain admission of dying declarations on wrongful-procurement-of-absence grounds before going to the often considerable trouble of putting on evidence to show that the crime victim had not believed he could recover. See, *e.g., King* v. *Commonwealth*, 4 Va., at 80–81 (three witnesses called to testify on the point); *Gibson* v. *Commonwealth*, 4 Va. 111, 116–117 (Gen. Ct. 1817) (testimony elicited from doctor and witness); *Anthony* v. *State*, 19 Tenn. 265, 278–279 (1838) (doctor questioned about expected fatality of victim's wound and about victim's demeanor).

The State offers another explanation for the above cases. It argues that when a defendant committed some act of wrongdoing that rendered a witness unavailable, he forfeited his right to object to the witness's testimony on confrontation grounds, but not on hearsay grounds. See Brief for Respondent 23–24. No case or treatise that we have found, however, suggested that a defendant who

committed wrongdoing forfeited his confrontation rights but not his hearsay rights. And the distinction would have been a surprising one, because courts prior to the founding excluded hearsay evidence in large part *because* it was unconfronted. See, *e.g.*, 2 Hawkins 606 (6th ed. 1787); 2 M. Bacon, A New Abridgment of the Law 313 (1736). As the plurality said in *Dutton* v. *Evans*, 400 U. S. 74, 86 (1970), "[i]t seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots."

The State and the dissent note that common-law authorities justified the wrongful-procurement rule by invoking the maxim that a defendant should not be permitted to benefit from his own wrong. See, *e.g.*, G. Gilbert, Law of Evidence 140–141 (1756) (if a witness was "detained and kept back from appearing by the means and procurement" testimony would be read because a defendant "shall never be admitted to shelter himself by such evil Practices on the Witness, that being to give him Advantage of his own Wrong"). But as the evidence amply shows, the "wrong" and the "evil Practices" to which these statements referred was conduct *designed* to prevent a witness from testifying. The absence of a forfeiture rule covering this sort of conduct would create an intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them. There is nothing mysterious about courts' refusal to carry the rationale further. The notion that judges may strip the defendant of a right that the Constitution deems essential to a fair trial, on the basis of a prior *judicial* assessment that the defendant is guilty as charged, does not sit well with the right to trial by jury. It is akin, one might say, to "dispensing with jury trial because a defendant is obviously guilty." *Crawford,* 541 U. S., at 62.

## C

Not only was the State's proposed exception to the right

of confrontation plainly not an "exceptio[n] established at the time of the founding," *id.*, at 54; it is not established in American jurisprudence *since* the founding. American courts never—prior to 1985—invoked forfeiture outside the context of deliberate witness tampering.

This Court first addressed forfeiture in *Reynolds* v. *United States*, 98 U. S. 145 (1879), where, after hearing testimony that suggested the defendant had kept his wife away from home so that she could not be subpoenaed to testify, the trial court permitted the government to introduce testimony of the defendant's wife from the defendant's prior trial. See *id.*, at 148–150. On appeal, the Court held that admission of the statements did not violate the right of the defendant to confront witnesses at trial, because when a witness is absent by the defendant's "wrongful procurement," the defendant "is in no condition to assert that his constitutional rights have been violated" if "their evidence is supplied in some lawful way." *Id.*, at 158. *Reynolds* invoked broad forfeiture principles to explain its holding. The decision stated, for example, that "[t]he Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts," *ibid.*, and that the wrongful-procurement rule "has its foundation" in the principle that no one should be permitted to take advantage of his wrong, and is "the outgrowth of a maxim based on the principles of common honesty," *id.*, at 159.

*Reynolds* relied on these maxims (as the common-law authorities had done) to be sure. But it relied on them (as the common-law authorities had done) to admit prior testimony in a case where the defendant had engaged in wrongful conduct designed to prevent a witness's testimony. The Court's opinion indicated that it was adopting the common-law rule. It cited leading common-law cases—*Lord Morley's Case, Harrison's Case,* and *Scaife*—described itself as "content with" the "long-established

usage" of the forfeiture principle, and admitted prior confronted statements under circumstances where admissibility was open to no doubt under *Lord Morley's Case*. *Reynolds, supra,* at 158–159.

If the State's rule had an historical pedigree in the common law or even in the 1879 decision in *Reynolds*, one would have expected it to be routinely invoked in murder prosecutions like the one here, in which the victim's prior statements inculpated the defendant. It was never invoked in this way. The earliest case identified by the litigants and *amici curiae* which admitted unconfronted statements on a forfeiture theory without evidence that the defendant had acted with the purpose of preventing the witness from testifying was decided in 1985. *United States* v. *Rouco,* 765 F. 2d 983 (CA11).

In 1997, this Court approved a Federal Rule of Evidence, entitled "Forfeiture by wrongdoing," which applies only when the defendant "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. Rule of Evid. 804(b)(6). We have described this as a rule "which codifies the forfeiture doctrine." *Davis* v. *Washington,* 547 U. S. 813, 833 (2006). Every commentator we are aware of has concluded the requirement of intent "means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable." 5 C. Mueller & L. Kirkpatrick, Federal Evidence §8:134, p. 235 (3d ed. 2007); 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence §804.03[7][b], p. 804–32 (J. McLaughlin ed., 2d ed. 2008); 2 S. Brown, McCormick on Evidence 176 (6th ed. 2006).[2] The commentators come out this way

———————

[2] Only a single state evidentiary code appears to contain a forfeiture rule broader than our holding in this case (and in *Crawford*) allow. Seven of the 12 States that recognize wrongdoing as grounds for forfeiting objection to out-of-court statements duplicate the language of the federal forfeiture provision that requires purpose, see Del. Rule Evid.

because the dissent's claim that knowledge is sufficient to show intent is emphatically *not* the modern view. See 1 W. LaFave, Substantive Criminal Law §5.2, p. 340 (2d ed. 2003).

In sum, our interpretation of the common-law forfeiture rule is supported by (1) the most natural reading of the language used at common law; (2) the absence of common-law cases *admitting* prior statements on a forfeiture theory when the defendant had not engaged in conduct designed to prevent a witness from testifying; (3) the common law's uniform exclusion of unconfronted inculpatory testimony by murder victims (except testimony given with awareness of impending death) in the innumerable cases in which the defendant was on trial for killing the victim, but was not shown to have done so for the purpose of preventing testimony; (4) a subsequent history in which the dissent's broad forfeiture theory has not been applied. The first two and the last are highly persuasive; the third

_____

804(b)(6) (2001); Ky. Rule Evid. 804(b)(5) (2004); N. D. Rule Evid. 804(b)(6) (2007); Pa. Rule Evid. 804(b)(6) (2005); Vt. Rule Evid. 804(b)(6) (2004); see also Tenn. Rule Evid. 804(b)(6) (2003) (identical except that it excludes mention of acquiescence); Mich. Rule Evid. 804(b)(6) (2008) (substitutes "engaged in or encouraged" for "engaged or acquiesced in"). Two others require "purpose" by their terms. Ohio Rule Evid. 804(B)(6) (2008); Cal. Evid. Code Ann. §1350 (West Supp. 2008). Two of the three remaining forfeiture provisions require the defendant to have "procured" the unavailability of a witness, Haw. Rule 804(b)(7) (2007); Md. Cts. & Jud. Proc. Code Ann. §10–901 (Lexis 2006)—which, as we have discussed, is a term traditionally used in the forfeiture context to require intent. Maryland's rule has thus been described as "requir[ing] that the judge must find that [the] wrongdoing or misconduct was undertaken with the intent of making the witness unavailable to testify." 6A L. McLain, Maryland Evidence, State and Federal §804(6):1, p. 230 (West Supp. 2007–2008). These rules cast more than a little doubt on the dissent's assertion that the historic forfeiture rule creates intolerable problems of proof. The lone forfeiture exception whose text reaches more broadly than the rule we adopt is an Oregon rule adopted in 2005. See 2005 Ore. Laws p. 1232, Ch. 458 (S. B. 287).

is in our view conclusive.

## D

### 1

The dissent evades the force of that third point by claiming that *no* testimony would come in at common law based on a forfeiture theory unless it was confronted. It explains the exclusion of murder victims' testimony by arguing that wrongful procurement was understood to be a basis for admission of Marian depositions—which the defendant would have had the opportunity to confront—but not for the admission of unconfronted testimony. See *post*, at 15.

That explanation is not supported by the cases. In *Harrison's Case,* the leading English case finding wrongful procurement, the witness's statements were admitted without regard to confrontation. An agent of the defendant had attempted to bribe a witness, who later disappeared under mysterious circumstances. The prosecutor contended that he had been "spirited, or withdrawn from us, by a gentleman that said he came to [the witness] from the prisoner, and desired him to be kind to the prisoner." 12 How. St. Tr., at 851. The court allowed the witness's prior statements before the coroner to be read, *id.*, at 852, although there was no reason to think the defendant would have been present at the prior examination.[3]

---

[3] Wrongful procurement was also described as grounds for admitting unconfronted testimony in *Fenwick's Case*, 13 How. St. Tr. 537 (H. C. 1696), a parliamentary attainder proceeding. Although many speakers argued for admission of unconfronted testimony simply because Parliament was not bound by the rules of evidence for felony cases, see *Crawford* v. *Washington*, 541 U. S. 36, 46 (2004), it was also argued that witness tampering could be a basis for admitting unconfronted statements even in common-law felony trials: "[W]here persons do stand upon their lives, accused for crimes, if it appears to the court that the prisoner hath, by fraudulent and indirect means, procured a person that hath given information against him to a proper magistrate, to withdraw himself, so that he cannot give evidence as regularly as they

The reasoning of the common-law authorities reinforces the conclusion that the wrongful-procurement rule did not depend on prior confrontation. The judge in *Harrison's Case,* after being told that "Mr. Harrison's agents or friends have, since the last sessions, made or conveyed away a young man that was a principal evidence against him," declared that if this were proved, "it will no way conduce to Mr. Harrison's advantage." *Id.,* at 835–836. Similarly, a leading treatise's justification of the use of statements from coroner's inquests when a witness was "detained and kept back from appearing by the means and procurement" of the defendant was that the defendant "shall never be admitted to shelter himself by such evil Practices on the Witness, that being to give him Advantage of his own Wrong." G. Gilbert, Law of Evidence 140 (1756). But if the defendant could keep out unconfronted prior testimony of a wrongfully detained witness he *would* profit from "such evil Practices."

While American courts understood the admissibility of statements made at prior proceedings (including coroner's inquests like the one in *Harrison's Case*) to turn on prior opportunity for cross-examination as a general matter, see *Crawford,* 541 U. S., at 47, n. 2, no such limit was applied or expressed in early wrongful-procurement cases. In *Rex* v. *Barber*, 1 Root 76 (Conn. Super. Ct. 1775), "[o]ne White, who had testified before the justice and before the grand-jury against Barber, and minutes taken of his testimony,

———————

used to do; in that case his information hath been read; which, I suppose, with humble submission, is this case . . . ." 13 How. St. Tr., at 594 (remarks of Lovel). The dissent responds that in most circumstances in which a witness had given information against a defendant before "'a proper magistrate,'" the testimony would have been confronted. *Post*, at 20. Perhaps so, but the speaker was arguing that the wrongful-procurement exception applied in "this case"—*Fenwick's Case*, in which the testimony was unconfronted, see 13 How. St. Tr., at 591–592.

was sent away by one Bullock, a friend of Barber's, and by his instigation; so that he could not be had to testify before the petit-jury. The court admitted witnesses to relate what White had before testified." Two leading evidentiary treatises and a Delaware case reporter cite that case for the proposition that grand jury statements were admitted on a wrongful-procurement theory. See Phillipps, Treatise on Evidence, at 200, n. (a); T. Peake, Compendium of the Law of Evidence 91, n. (m) (American ed. 1824); *State* v. *Lewis*, 1 Del. Cas. 608, 609, n. 1 (Ct. Quarter Sess. 1818). (Of course the standard practice since approximately the 17th century has been to conduct grand jury proceedings in secret, without confrontation, in part so that the defendant does not learn the State's case in advance. S. Beale, W. Bryson, J. Felman, & M. Elston, Grand Jury Law and Practice §5.2 (2d ed. 2005); see also 8 J. Wigmore Evidence §2360, pp. 728–735 (J. McNaughton rev. 1961)).[4]

The Georgia Supreme Court's articulation of the forfeiture rule similarly suggests that it understood forfeiture to be a basis for admitting unconfronted testimony. The court wrote that *Lord Morley's Case* established that if a witness "who had been examined by the Crown, and was then absent, was detained by the means or procurement of the prisoner," "then the examination should be read" into evidence. *Williams* v. *State,* 19 Ga. 402, 403 (1856). Its rule for all cases in which the witness "had been examined by the Crown" carried no confrontation limit, and indeed,

_____

[4] Three commentators writing more than a century after the *Barber* decision, said, without explanation, that they understood the case to have admitted only confronted testimony at a preliminary examination. W. Best, The Principles of the Law of Evidence 473, n. (e) (American ed. 1883); J. Stephen, A Digest of the Law of Evidence 161 (1902); 2 J. Bishop, New Criminal Procedure §1197, p. 1024 (2d ed. 1913). We know of no basis for that understanding. The report of the case does not limit the admitted testimony to statements that were confronted.

the court adopted the rule from *Lord Morley's Case* which involved not Marian examinations carrying a confrontation requirement, but coroner's inquests that lacked one.

The leading American case on forfeiture of the confrontation right by wrongful procurement was our 1879 decision in *Reynolds*. That case does not set forth prior confrontation as a requirement for the doctrine's application, and begins its historical analysis with a full description of the rule set forth in *Lord Morley's Case*, which itself contained no indication that the admitted testimony must have been previously confronted. It followed that description with a citation of *Harrison's Case*—which, like *Lord Morley's Case*, applied wrongful procurement to coroner's inquests, not confronted Marian examinations—saying that the rule in those cases "seems to have been recognized as the law of England ever since." 98 U. S., at 158. The opinion's description of the forfeiture rule is likewise unconditioned by any requirement of prior confrontation:

> "The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he kept away. . . . [The Constitution] grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated." *Ibid*.

There is no mention in this paragraph of a need for prior confrontation, even though if the Court believed such a limit applied, the phrase "their evidence is supplied" would more naturally have read "their previously con-

fronted evidence is supplied." *Crawford* reaffirmed this understanding by citing *Reynolds* for a forfeiture exception to the confrontation right. 541 U. S., at 54. And what *Reynolds* and *Crawford* described as the law became a seeming holding of this Court in *Davis*, which, after finding an absent witness's unconfronted statements introduced at trial to have been testimonial, and after observing that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation," 547 U. S., at 833, remanded with the instruction that "[t]he Indiana courts may (if they are asked) determine on remand whether . . . a claim of forfeiture is properly raised and, if so, whether it is meritorious," *id.* at 834.

Although the case law is sparse, in light of these decisions and the absence of even a single case *declining* to admit unconfronted statements of an absent witness on wrongful-procurement grounds when the defendant sought to prevent the witness from testifying, we are not persuaded to displace the understanding of our prior cases that wrongful procurement permits the admission of prior unconfronted testimony.

But the parsing of cases aside, the most obvious problem with the dissent's theory that the forfeiture rule applied only to confronted testimony is that it amounts to self-immolation. If it were true, it would destroy not only our case for a narrow forfeiture rule, but the dissent's case for a broader one as well. Prior *confronted* statements by witnesses who are unavailable are admissible whether or not the defendant was responsible for their unavailability. *Id.*, at 68. If the forfeiture doctrine did not admit unconfronted prior testimony at common law, the conclusion must be, not that the forfeiture doctrine requires no specific intent in order to render unconfronted testimony available, but that unconfronted testimony is subject to no

forfeiture doctrine at all.[5]

### 2

Having destroyed its own case, the dissent issues a thinly veiled invitation to overrule *Crawford* and adopt an approach not much different from the regime of *Ohio* v. *Roberts*, 448 U. S. 56 (1980), under which the Court would create the exceptions that it thinks consistent with the policies underlying the confrontation guarantee, regardless of how that guarantee was historically understood. The "basic purposes and objectives" of forfeiture doctrine, it says, require that a defendant who wrongfully caused the absence of a witness be deprived of his confrontation rights, whether or not there was any such rule applicable at common law. *Post*, at 4.

If we were to reason from the "basic purposes and objectives" of the forfeiture doctrine, we are not at all sure we would come to the dissent's favored result. The common-law forfeiture rule was aimed at removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in "the ability of courts to protect the integrity of their proceedings." *Davis,* 547 U. S., at 834. The boundaries of the doctrine seem to us intelligently fixed so as to avoid a principle repugnant to our constitutional system of trial by jury: that those murder defendants whom the judge considers guilty (after less than a full trial, mind you, and of course before the jury has pronounced guilt) should be deprived of fair-trial rights, lest they benefit

---

[5] The dissent attempts to reconcile its approach with *Crawford* by saying the wrongful-procurement cases used language "broad enough" to reach every case in which a defendant committed wrongful acts that caused the absence of a victim, and that there was therefore an "'exception" "established at the time of the founding,'" *post*, at 3, reaching all such misconduct. But an exception to what? The dissent contends that it was *not* an exception to confrontation. Were that true, it would be the end of the *Crawford* inquiry.

from their judge-determined wrong.[6]

Since it is most certainly *not* the norm that trial rights can be "forfeited" on the basis of a prior judicial determination of guilt, the dissent must go far afield to argue even by analogy for its forfeiture rule. See *post,* at 5 (discussing common-law doctrine that prohibits the murderer from collecting insurance on the life of his victim, or an inheritance from the victim's estate); *post*, at 6 (noting that many criminal statutes punish a defendant regardless of his purpose). These analogies support propositions of which we have no doubt: States may allocate property rights as they see fit, and a murderer can and should be punished, without regard to his purpose, after a fair trial. But a legislature may not "punish" a defendant for his evil acts by stripping him of the right to have his guilt in a criminal proceeding determined *by a jury*, and on the basis of evidence the Constitution deems reliable and admissible.

—————

[6]The dissent identifies one circumstance—and only one—in which a court may determine the outcome of a case before it goes to the jury: A judge may determine the existence of a conspiracy in order to make incriminating statements of co-conspirators admissible against the defendant under Federal Rule of Evidence 801(d)(2)(E). *Bourjaily* v. *United States*, 483 U. S. 171 (1987), held that admission of the evidence did not violate the Confrontation Clause because it "falls within a firmly rooted hearsay exception"—the test under *Ohio* v. *Roberts*, 448 U. S. 56, 66 (1980), the case that *Crawford* overruled. In fact it did not violate the Confrontation Clause for the quite different reason that it was not (as an incriminating statement in furtherance of the conspiracy would probably never be) testimonial. The co-conspirator hearsay rule does not pertain to a constitutional right and is in fact quite unusual.

We do not say, of course, that a judge can never be allowed to inquire into guilt of the charged offense in order to make a preliminary evidentiary ruling. That must sometimes be done under the forfeiture rule that we adopt—when, for example, the defendant is on trial for murdering a witness in order to prevent his testimony. But the exception to ordinary practice that we support is (1) needed to protect the integrity of court proceedings, (2) based upon longstanding precedent, and (3) much less expansive than the exception proposed by the dissent.

The larger problem with the dissent's argument, however, is that the guarantee of confrontation is no guarantee at all if it is subject to whatever exceptions courts from time to time consider "fair." It is not the role of courts to extrapolate from the words of the Sixth Amendment to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts' views) those underlying values. The Sixth Amendment seeks fairness indeed—but seeks it through very specific means (one of which is confrontation) that were the trial rights of Englishmen. It "does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." *Crawford, supra*, at 54.[7]

E

The dissent closes by pointing out that a forfeiture rule which ignores *Crawford* would be particularly helpful to women in abusive relationships—or at least particularly helpful in punishing their abusers. Not as helpful as the dissent suggests, since only *testimonial* statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules, which are free to adopt the dissent's version of forfeiture by wrongdoing. In any event, we are puzzled by the dissent's decision to devote its peroration to domestic abuse cases. Is the suggestion that we should have one Confron-

---

[7] The dissent also implies that we should not adhere to *Crawford* because the confrontation guarantee limits the evidence a State may introduce without limiting the evidence a defendant may introduce. See *post,* at 9. That is true. Just as it is true that the State cannot decline to provide testimony harmful to its case or complain of the lack of a speedy trial. The asymmetrical nature of the Constitution's criminal-trial guarantees is not an anomaly, but the intentional conferring of privileges designed to prevent criminal conviction of the innocent. The State is at no risk of that.

tation Clause (the one the Framers adopted and *Crawford* described) for all other crimes, but a special, improvised, Confrontation Clause for those crimes that are frequently directed against women? Domestic violence is an intolerable offense that legislatures may choose to combat through many means—from increasing criminal penalties to adding resources for investigation and prosecution to funding awareness and prevention campaigns. But for that serious crime, as for others, abridging the constitutional rights of criminal defendants is not in the State's arsenal.

The domestic-violence context is, however, relevant for a separate reason. Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify. This is not, as the dissent charges, *post*, at 25, nothing more than "knowledge-based intent." (Emphasis deleted.)

The state courts in this case did not consider the intent of the defendant because they found that irrelevant to application of the forfeiture doctrine. This view of the law was error, but the court is free to consider evidence of the defendant's intent on remand.

\*     \*     \*

We decline to approve an exception to the Confrontation Clause unheard of at the time of the founding or for 200 years thereafter.  The judgment of the California Supreme Court is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 07–6053

DWAYNE GILES, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF CALIFORNIA

[June 25, 2008]

JUSTICE THOMAS, concurring.

I write separately to note that I adhere to my view that statements like those made by the victim in this case do not implicate the Confrontation Clause. The contested evidence is indistinguishable from the statements made during police questioning in response to the report of domestic violence in *Hammon* v. *Indiana*, decided with *Davis* v. *Washington*, 547 U. S. 813 (2006). There, as here, the police questioning was not "a formalized dialogue"; it was not "sufficiently formal to resemble the Marian examinations" because "the statements were neither Mirandized nor custodial, nor accompanied by any similar indicia of formality"; and "there is no suggestion that the prosecution attempted to offer [Ms. Avie's] hearsay evidence at trial in order to evade confrontation." See *id.*, at 840 (THOMAS, J., concurring in judgment in part and dissenting in part).

Nonetheless, in this case respondent does not argue that the contested evidence is nontestimonial, *ante*, at 3; the court below noted "no dispute" on the issue, 40 Cal. 4th 833, 841, 152 P. 3d 433, 438 (2007); and it is outside the scope of the question presented, Brief for Petitioner i. Because the Court's opinion accurately reflects our Confrontation Clause jurisprudence where the applicability of that Clause is not at issue, I join the Court in vacating the decision below.

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–6053

———————

## DWAYNE GILES, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF CALIFORNIA

[June 25, 2008]

JUSTICE ALITO, concurring.

I join the Court's opinion, but I write separately to make clear that, like JUSTICE THOMAS, I am not convinced that the out-of-court statement at issue here fell within the Confrontation Clause in the first place.  The dissent's displeasure with the result in this case is understandable, but I suggest that the real problem concerns the scope of the confrontation right.  The Confrontation Clause does not apply to out-of-court statements unless it can be said that they are the equivalent of statements made at trial by "witnesses."  U. S. Const., Amdt. 6.  It is not at all clear that Ms. Avie's statement falls within that category.  But the question whether Ms. Avie's statement falls within the scope of the Clause is not before us, and assuming for the sake of argument that the statement falls within the Clause, I agree with the Court's analysis of the doctrine of forfeiture by wrongdoing.

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–6053

———————

## DWAYNE GILES, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF CALIFORNIA

[June 25, 2008]

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins,
concurring in part.

I am convinced that the Court's historical analysis is
sound and I join all but Part II–D–2 of the opinion. As the
Court demonstrates, the confrontation right as understood
at the Framing and ratification of the Sixth Amendment
was subject to exception on equitable grounds for an ab-
sent witness's prior relevant, testimonial statement, when
the defendant brought about the absence with intent to
prevent testimony. It was, and is, reasonable to place the
risk of untruth in an unconfronted, out-of-court statement
on a defendant who meant to preclude the testing that
confrontation provides. The importance of that intent in
assessing the fairness of placing the risk on the defendant
is most obvious when a defendant is prosecuted for the
very act that causes the witness's absence, homicide being
the extreme example. If the victim's prior statement were
admissible solely because the defendant kept the witness
out of court by committing homicide, admissibility of the
victim's statement to prove guilt would turn on finding the
defendant guilty of the homicidal act causing the absence;
evidence that the defendant killed would come in because
the defendant probably killed. The only thing saving
admissibility and liability determinations from question
begging would be (in a jury case) the distinct functions of
judge and jury: judges would find by a preponderance of

evidence that the defendant killed (and so would admit the testimonial statement), while the jury could so find only on proof beyond a reasonable doubt. Equity demands something more than this near circularity before the right to confrontation is forfeited, and more is supplied by showing intent to prevent the witness from testifying. Cf. *Davis* v. *Washington*, 547 U. S. 813, 833 (2006).

It is this rationale for the limit on the forfeiture exception rather than a dispositive example from the historical record that persuades me that the Court's conclusion is the right one in this case. The contrast between the Court's and JUSTICE BREYER's careful examinations of the historical record tells me that the early cases on the exception were not calibrated finely enough to answer the narrow question here. The historical record as revealed by the exchange simply does not focus on what should be required for forfeiture when the crime charged occurred in an abusive relationship or was its culminating act; today's understanding of domestic abuse had no apparent significance at the time of the Framing, and there is no early example of the forfeiture rule operating in that circumstance.

Examining the early cases and commentary, however, reveals two things that count in favor of the Court's understanding of forfeiture when the evidence shows domestic abuse. The first is the substantial indication that the Sixth Amendment was meant to require some degree of intent to thwart the judicial process before thinking it reasonable to hold the confrontation right forfeited; otherwise the right would in practical terms boil down to a measure of reliable hearsay, a view rejected in *Crawford* v. *Washington*, 541 U. S. 36 (2004). The second is the absence from the early material of any reason to doubt that the element of intention would normally be satisfied by the intent inferred on the part of the domestic abuser in the classic abusive relationship, which is meant to isolate

the victim from outside help, including the aid of law enforcement and the judicial process. If the evidence for admissibility shows a continuing relationship of this sort, it would make no sense to suggest that the oppressing defendant miraculously abandoned the dynamics of abuse the instant before he killed his victim, say in a fit of anger. The Court's conclusion in Part II–E thus fits the rationale that equity requires and the historical record supports.

# SUPREME COURT OF THE UNITED STATES

No. 07–6053

DWAYNE GILES, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF CALIFORNIA

[June 25, 2008]

JUSTICE BREYER, with whom JUSTICE STEVENS and JUSTICE KENNEDY join, dissenting.

In *Crawford* v. *Washington*, 541 U. S. 36 (2004), we held that the Sixth Amendment's Confrontation Clause bars admission against a criminal defendant of an un-cross-examined "testimonial" statement that an unavailable witness previously made out of court. *Id.*, at 68. We simultaneously recognized an exception: that the defendant, by his own "wrongdoing," can forfeit "on essentially equitable grounds" his Confrontation Clause right. *Id.*, at 62. In *Davis* v. *Washington,* 547 U. S. 813 (2006), we again recognized this exception, stating that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Id.*, at 833.

This case involves a witness who, crying as she spoke, told a police officer how her former boyfriend (now, the defendant) had choked her, "opened a folding knife," and "threatened to kill her." *Ante*, at 2 (opinion of the Court). Three weeks later, the defendant did kill her. At his murder trial, the defendant testified that he had acted in self-defense. To support that assertion, he described the victim as jealous, vindictive, aggressive, and violent. To rebut the defendant's claim of self-defense and impeach his testimony, the State introduced into evidence the witness' earlier uncross-examined statements (as state hearsay law permits it to do) to help rebut the defendant's

claim of self-defense. It is important to underscore that this case is premised on the assumption, not challenged here, that the witness' statements are testimonial for purposes of the Confrontation Clause. With that understanding, we ask whether the defendant, through his wrongdoing, has forfeited his Confrontation Clause right. The Court concludes that he may not have forfeited that right. In my view, however, he has.

I

Like the majority, I believe it important to recognize the relevant history and I start where the majority starts, with *Lord Morley's Case*, 6 How. St. Tr. 769 (H. L. 1666). In that case, the judges of the House of Lords wrote that a coroner's out-of-court "examinations" of witnesses "might be read" in court if "the witnesses . . . were dead or unable to travel." *Id.*, at 770. Additionally, they agreed, an examination "might be read" if the "witness who had been examined by the coroner, and was then absent, *was detained by the means or procurement of the prisoner.*" *Id.*, at 770–771 (emphasis added). Later cases repeated this rule and followed it, admitting depositions where, *e.g.*, "there ha[d] been evidence given of ill practice to take [the witness] out of the way," *Harrison's Case*, 12 How. St. Tr. 833, 868 (H. L. 1692), where "the prisoner ha[d], by fraudulent and indirect means, procured a person that hath given information against him to a proper magistrate, to withdraw himself," *Lord Fenwick's Case*, 13 How. St. Tr. 537, 594 (H. C. 1696), where the prisoner "had resorted to a contrivance to keep the witness out of the way," *Queen* v. *Scaife,* 17 Ad. E. 238, 242, 117 Eng. Rep. 1271, 1273 (Q. B. 1851), and so forth.

Nineteenth-century American case law on the subject said approximately the same thing. See *Reynolds* v. *United States*, 98 U. S. 145, 158 (1879). For example, an 1819 South Carolina case held that a witness' prior formal

examination could be admitted because "the witness had been kept away by the contrivance of the opposite party." *Drayton* v. *Wells*, 10 S. C. L. 409, 411. An 1856 Georgia case, relying on *Lord Morley's Case*, held that a similar "examination should be read" if the witness "was detained by means or procurement of the prisoner." *Williams* v. *State*, 19 Ga. 403. And in 1878, this Court held that "if a witness is absent by [the defendant's] . . . own wrongful procurement, he cannot complain" about the admission of the witness' prior testimonial statement. *Reynolds, supra*, at 158.

*Reynolds* stated that, "if [the defendant] voluntarily keeps the witnesses away, he cannot insist on" the "privilege of being confronted with the witnesses against him," in part because of *Lord Morley's Case* and in part because the rule of forfeiture "has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong . . . a maxim based on the principles of common honesty." 98 U. S., at 158–159.

These sources make clear that "forfeiture by wrongdoing" satisfies *Crawford'*s requirement that the Confrontation Clause be "read as a reference to the right of confrontation at common law" and that "any exception" must be "established at the time of the founding." 541 U. S., at 54. The remaining question concerns the precise metes and bounds of the forfeiture by wrongdoing exception. We ask how to apply that exception in the present case.

## II

There are several strong reasons for concluding that the forfeiture by wrongdoing exception applies here—reasons rooted in common-law history, established principles of criminal law and evidence, and the need for a rule that can be applied without creating great practical difficulties and evidentiary anomalies.

*First,* the language that courts have used in setting

forth the exception is broad enough to cover the wrongdoing at issue in the present case (murder) and much else besides. A witness whom a defendant murders is kept from testifying "by the means . . . of the prisoner" *i.e.*, the defendant, *Lord Morley's Case*, *supra*, at 771; murder is indeed an "ill practice," that leads to the witness' absence, *Harrison's Case*, *supra*, at 868; one can fairly call a murder a "contrivance to keep the witness out of the way", *Queen* v. *Scaife*, *supra*, at 242, 117 Eng. Rep., at 1273*;* murder, if not a "fraudulent and indirect means" of keeping the witness from testifying, is a far worse, direct one, *Fenwick's Case*, *supra*, at 594; and when a witness is "absent" due to murder, the killer likely brought about that absence by his "own wrongful procurement," *Reynolds*, *supra*, at 158. All of the relevant English and American cases use approximately similar language. See, *e.g.*, 1 G. Gilbert, Law of Evidence 214–215 (1791) (examinations are "to be read on the Trial" where it can be proved that the witness is "kept back from appearing by the means and procurement of the prisoner"). And I have found no case that uses language that would not bring a murder and a subsequent trial for murder within its scope.

*Second,* an examination of the forfeiture rule's basic purposes and objectives indicates that the rule applies here. At the time of the founding, a leading treatise writer described the forfeiture rule as designed to assure that the prisoner "shall never be admitted to shelter himself by such evil Practices on the Witness, that being to give him Advantage of his own Wrong." *Id.,* at 214–215. This Court's own leading case explained the exception as finding its "foundation in the maxim that no one shall be permitted to take advantage of his own wrong." *Reynolds*, *supra*, at 159. What more "evil practice," what greater "wrong," than to murder the witness? And what greater evidentiary "advantage" could one derive from that wrong than thereby to prevent the witness from testifying, *e.g.*,

preventing the witness from describing a history of physical abuse that is not consistent with the defendant's claim that he killed her in self-defense?

*Third*, related areas of the law motivated by similar equitable principles treat forfeiture or its equivalent similarly. The common law, for example, prohibits a life insurance beneficiary who murders an insured from recovering under the policy. See, *e.g.*, *New York Mut. Life Ins. Co.* v. *Armstrong*, 117 U. S. 591, 600 (1886) ("It would be a reproach to the jurisprudence of the country, if one could recover insurance money payable on the death of a party whose life he had feloniously taken"). And it forbids recovery when the beneficiary "feloniously kills the insured, *irrespective of the purpose.*" *National Life Ins. Co.* v. *Hood's Adm'r*, 264 Ky. 516, 518, 94 S. W. 2d 1022, 1023 (Ct. App. 1936) (emphasis added) ("no difference of opinion among the courts" on the matter). Similarly, a beneficiary of a will who murders the testator cannot inherit under the will. See 1 W. Page, Wills §17.19, pp. 999–1001 (2003). And this is so "whether the crime was committed for that very purpose or with some other felonious design." *Van Alstyne* v. *Tuffy*, 103 Misc. 455, 459, 169 N. Y. S. 173, 175 (1918); see also 1 Page, *supra,* §17.19, at 1002 ("[T]his common law doctrine applies alike whether the devisee is guilty of murder, or of manslaughter" (footnote omitted)); see generally H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 76–94 (W. Eskridge & P. Frickey eds. 1994) (discussing so-called "slayer's rules"); Wade, Acquisition of Property by Willfully Killing Another—A Statutory Solution, 49 Harv. L. Rev. 715, 716 (1936) ("[I]t must be recognized that . . . the adoption of some means to prevent a slayer from acquiring property as the result of the death of a man whom he has killed is desirable").

*Fourth*, under the circumstances presented by this case, there is no difficulty demonstrating the defendant's intent.

This is because the defendant here knew that murdering his ex-girlfriend would keep her from testifying; and that knowledge is sufficient to show the *intent* that law ordinarily demands. As this Court put the matter more than a century ago: A "'man who performs an act which it is known will produce a particular result is from our common experience presumed to have anticipated that result and to have intended it.'" *Allen* v. *United States*, 164 U. S. 492, 496 (1896); see *United States* v. *Aguilar*, 515 U. S. 593, 613 (1995) (SCALIA, J., dissenting) ("[T]he jury is entitled to presume that a person intends the natural and probable consequences of his acts"); see also G. Williams, Criminal Law §18, p. 38 (2d ed. 1961) ("There is one situation where a consequence is deemed to be intended though it is not desired. This is where it is foreseen as substantially certain"); ALI, Model Penal Code §2.02(2)(b)(ii) (1962) (a person acts "knowingly" if "the element involves a result of his conduct" and "he is aware that it is practically certain that his conduct will cause such a result"); Restatement (Second) of Torts §8A (1977) ("The word 'intent' is used throughout . . . to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it").

With a few criminal law exceptions not here relevant, the law holds an individual responsible for consequences known likely to follow just as if that individual had intended to achieve them. A defendant, in a criminal or a civil case, for example, cannot escape criminal or civil liability for murdering an airline passenger by claiming that his purpose in blowing up the airplane was to kill only a single passenger for her life insurance, not the others on the same flight. See 1 W. LaFave, Substantive Criminal Law §5.2(a), p. 341 (2003).

This principle applies here. Suppose that a husband, H, knows that after he assaulted his wife, W, she gave state-

ments to the police. Based on the fact that W gave statements to the police, H also knows that it is possible he will be tried for assault. If H then kills W, H cannot avoid responsibility for intentionally preventing W from testifying, not even if H says he killed W because he was angry with her and not to keep her away from the assault trial. Of course, the trial here is not for assault; it is for murder. But I should think that this fact, because of the nature of the crime, would count as a stronger, not a weaker, reason for applying the forfeiture rule. Nor should it matter that H, at the time of the murder, may have *believed* an assault trial *more likely* to take place than a murder trial, for W's unavailability to testify at *any* future trial was a *certain* consequence of the murder. And any reasonable person would have known it. Cf. *United States* v. *Falstaff Brewing Corp.*, 410 U. S. 526, 570, n. 22 (1973) (Marshall, J., concurring in result) ("[P]erhaps the oldest rule of evidence—that a man is presumed to intend the natural and probable consequences of his acts—is based on the common law's preference for objectively measurable data over subjective statements of opinion and intent").

The majority tries to overcome this elementary legal logic by claiming that the "forfeiture rule" applies, not where the defendant *intends* to prevent the witness from testifying, but only where that is the defendant's *purpose, i.e.,* that the rule applies only where the defendant acts from a particular *motive,* a *desire* to keep the witness from trial. See *ante*, at 5–6 (asserting that the terms used to describe the scope of the forfeiture rule "suggest that the exception applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying" and that a "purpose-based definition . . . governed"). But the law does not often turn matters of responsibility upon *motive,* rather than *intent.* See *supra*, at 5. And there is no reason to believe that application of the rule of forfeiture constitutes an exception to this general legal

principle.

   Indeed, to turn application of the forfeiture rule upon proof of the defendant's *purpose* (rather than *intent),* as the majority does, creates serious practical evidentiary problems. Consider H who assaults W, knows she has complained to the police, and then murders her. H *knows* that W will be unable to testify against him at any future trial. But who knows whether H's knowledge played a major role, a middling role, a minor role, or no role at all, in H's decision to kill W? Who knows precisely what passed through H's mind at the critical moment? See, *e.g.*, *State* v. *Romero*, 2007–NMSC–013, 156 P. 3d 694, 702–703 (finding it doubtful that evidence associated with the murder would support a finding that the *purpose* of the murder was to keep the victim's earlier statements to police from the jury).

   Moreover, the majority's insistence upon a showing of *purpose* or *motive* cannot be squared with the exception's basically ethical objective. If H, by killing W, is able to keep W's testimony out of court, then he has successfully "take[n] advantage of his own wrong." *Reynolds*, 98 U. S., at 159. And he does so whether he killed her *for the purpose of* keeping her from testifying, with *certain knowledge* that she will not be able to testify, or with *a belief* that rises to a *reasonable level of probability*. The inequity consists of his being able to *use* the killing to keep out of court her statements against him. That inequity exists whether the defendant's state of mind is purposeful, intentional (*i.e.*, with knowledge), or simply probabilistic.

   *Fifth,* the majority's approach both creates evidentiary anomalies and aggravates existing evidentiary incongruities. Contrast (a) the defendant who assaults his wife and subsequently threatens her with harm if she testifies, with (b) the defendant who assaults his wife and subsequently murders her in a fit of rage. Under the majority's interpretation, the former (whose threats make clear that his

purpose was to prevent his wife from testifying) cannot benefit from his wrong, but the latter (who has committed what is undoubtedly the greater wrong) can. This is anomalous, particularly in this context where an equitable rule applies.

Now consider a trial of H for the murder of W at which H claims self-defense. As the facts of this very case demonstrate, H may be allowed to testify at length and in damning detail about W's behavior—what she said as well as what she did—both before and during the crime. See, *e.g.*, Tr. 643–645 (Apr. 1, 2003). H may be able to introduce some of W's statements (as he remembers them) under hearsay exceptions for excited utterances or present sense impressions or to show states of mind (here the victim's statements were admitted through petitioner's testimony to show her state of mind). W, who is dead, cannot reply. This incongruity arises in part from the nature of hearsay and the application of ordinary hearsay rules. But the majority would aggravate the incongruity by prohibiting admission of W's out-of-court statements to the police (which contradict H's account), even when they too fall within a hearsay exception, simply because there is *no evidence that H was focused on his future trial* when he killed her. There is no reason to do so.

Consider also that California's hearsay rules authorize admission of the out-of-court statement of an unavailable declarant where the statement describes or explains the "infliction or threat of physical injury upon the declarant," if the "statement" was "made at or near the time of the infliction or threat of physical injury." Cal. Evid. Code Ann. §1370 (Supp. 2008). Where a victim's statement is not "testimonial," perhaps because she made it to a nurse, the statement could come into evidence under this rule. But where the statement is made formally to a police officer, the majority's rule would keep it out. Again this incongruity arises in part because of pre-existing confron-

tation-related rules. See *Davis*, 547 U. S., at 830, n. 5
("[F]ormality is indeed essential to testimonial utterance").
But, again, the majority would aggravate the incongruity
by prohibiting admission of W's out-of-court statements to
the police simply because there is *no evidence that H was
focused on his future trial* when he killed her. Again,
there is no reason to do so.

*Sixth,* to deny the majority's interpretation is not to
deny defendants evidentiary safeguards. It does, of
course, in this particular area, deny defendants the right
*always* to cross-examine. But the hearsay rule has always
contained exceptions that permit the admission of evi-
dence where the need is significant and where alternative
safeguards of reliability exist. Those exceptions have
evolved over time, see 2 K. Brown, McCormick on Evi-
dence §326 (2006) (discussion the development of the
modern hearsay rule); Fed. Rule Evid. 102 ("[T]hese rules
shall be construed to secure . . . promotion of growth
and development of the law of evidence"), often in a direc-
tion that permits admission of hearsay only where ade-
quate alternative assurance of reliability exists, see, *e.g.*,
Rule 807 (the "Residual Exception"). Here, for example,
the presence in court of a witness who took the declarant's
statement permits cross-examination of that witness as to
just what the declarant said and as to the surrounding
circumstances, while those circumstances themselves
provide sufficient guarantees of accuracy to warrant ad-
mission under a State's hearsay exception. See Cal. Evid.
Code Ann. §1370.

More importantly, to apply the forfeiture exception here
simply lowers a constitutional barrier to admission of
earlier testimonial statements; it does not *require* their
admission. State hearsay rules remain in place; and those
rules will determine when, whether, and how evidence of
the kind at issue here will come into evidence. A State, for
example, may enact a forfeiture rule as one of its hearsay

exceptions, while simultaneously reading into that rule requirements limiting its application. See *ante*, at 13–14, n. 2. To lower the constitutional barrier to admission is to allow the States to do just that, *i.e.*, to apply their evidentiary rules with flexibility and to revise their rules as experience suggests would be advisable. The majority's rule, which requires exclusion, would deprive the States of this freedom and flexibility.

## III
## A

The majority tries to find support for its view in 17th-, 18th-, and 19th-century law of evidence. But a review of the cases set forth in Part I, *supra*, makes clear that no case limits forfeiture to instances where the defendant's *purpose* or *motivation* is to keep the witness away. See *supra*, at 2–3. To the contrary, this Court stated in *Reynolds* that the "Constitution does not guarantee an accused person against the *legitimate* consequences of his own wrongful acts." 98 U. S., at 158 (emphasis added). The words "legitimate consequences" do *not* mean "desired consequences" or refer to purpose or motive; in fact, the words "legitimate consequences" can encompass *imputed* consequences as well as *intended* consequences. And this Court's statement in *Reynolds* that the rule "has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong" suggests that forfeiture applies where the defendant benefits from a witness' absence, regardless of the defendant's specific purpose. *Id.,* at 159.

Rather than limit forfeiture to instances where the defendant's act has absence of the witness as its *purpose*, the relevant cases suggest that the forfeiture rule would apply where the witness' absence was the *known consequence* of the defendant's intentional wrongful act. *Lord Morley's Case* and numerous others upon which the forfei-

ture rule is based say that a Marian deposition (*i.e.*, a deposition taken by a coroner or magistrate pursuant to the Marian bail and commitment statutes) may be read to the jury if the witness who was absent was detained "by means or procurement of the prisoner." *Lord Morley's Case*, 6 How. St. Tr., at 771. The phrase "by means of" focuses on what the defendant *did*, not his *motive for (or purpose in) doing it*. In *Diaz* v. *United States*, 223 U. S. 442 (1912)*, which followed *Reynolds*, this Court used the word "by" (the witness was absent "by the wrongful act of" the accused), a word that suggests causation, not motive or purpose. *Id.*, at 452; see *Eureka Lake & Yuba Canal Co.* v. *Superior Court of Yuba Cty.*, 116 U. S. 410, 418 (1886). And in *Motes* v. *United States*, 178 U. S. 458, 473–474 (1900)*, the Court spoke of absence "with the assent of" the defendant, a phrase perfectly consistent with an absence that is *a consequence of*, not *the purpose of*, what the assenting defendant hoped to accomplish.

Petitioner's argument that the word "procurement" implies purpose or motive is unpersuasive. See Brief for Petitioner 26–28. Although a person may "procure" a result purposefully, a person may also "procure" a result by causing it, as the word "procure" can, and at common law did, mean "cause," "bring about," and "effect," all words that say nothing about motive or purpose. 2 N. Webster, An American Dictionary of the English Language (1828); see also 2 C. Richardson, New Dictionary of the English Language 1514 (1839) (defining "procure" to mean "[t]o take care for; to take care or heed, . . . that any thing be done; to urge or endeavor, to manage or contrive that it be done; to acquire; to obtain"). The majority's similar argument about the word "contrivance" fares no better. See *ante*, at 6 (citing, *e.g.*, 1 J. Chitty, A Practical Treatise on the Criminal Law 81 (1816) (hereinafter Chitty) ("kept away by the means and contrivance of the prisoner")). Even if a defendant had contrived, *i.e.*, de-

vised or planned, to murder a victim, thereby keeping her away, it does not mean that he did so with the purpose of keeping her away in mind. Regardless, the relevant phrase in *Lord Morley's Case* is "by *means or* procurement of" the defendant. 6 How. St. Tr., at 771 (emphasis added). And, as I have explained, an absence "by means of" the defendant's actions may, or may not, refer to an absence that the defendant desired, as compared to an absence that the defendant caused.

The sole authority that expressly supports the majority's interpretation is an 1858 treatise stating that depositions were admissible if the witness "had been kept out of the way by the prisoner, or by some one on the prisoner's behalf, in order to prevent him from giving evidence against him." E. Powell, Practice of the Law of Evidence 166. This treatise was written nearly 70 years after the founding; it does not explain the basis for this conclusion; and, above all, it concerns a *complete* exception to the *hearsay rule.* Were there no such limitation, all a murder victim's hearsay statements, not simply the victim's testimonial statements, could be introduced into evidence. Here we deal only with a constitutional bar to the admission of *testimonial* statements. And an exception from the general constitutional bar does not automatically admit the evidence. Rather, it leaves the State free to decide, via its own hearsay rules and hearsay exceptions, which such statements are sufficiently reliable to admit.

## B

Given the absence of any evidence squarely requiring purpose rather than intent, what is the majority to say? The majority first tries to draw support from the *absence* of any *murder* case in which the victim's Marian statement was read to the jury on the ground that the defendant had killed the victim. See *ante*, at 7–10. I know of no instance in which this Court has drawn a conclusion about

the meaning of a common-law rule *solely* from the absence of cases showing the contrary—at least not where there are other plausible explanations for that absence. And there are such explanations here.

The most obvious reason why the majority cannot find an instance where a court applied the rule of forfeiture at a murder trial is that many (perhaps all) common-law courts thought the rule of forfeiture irrelevant in such cases. In a murder case, the relevant witness, the murder victim, was dead; and historical legal authorities tell us that, when a witness was dead, the common law admitted a Marian statement. See, *e.g.*, *Lord Morley's Case, supra*, at 770–77 (Marian depositions "might be read" if the witness was "dead or unable to travel"); *King* v. *Woodcock*, 1 Leach 500, 502, 168 Eng. Rep. 352, 353 (1789) ("[I]f the deponent should die between the time of examination and the trial of the prisoner, [the Marian deposition] may be substituted in the room of that *viva voce* testimony which the deponent, if living, could alone have given, and is admitted of necessity as evidence of the fact"); J. Archbold, A Summary of the Law Relative to Pleading and Evidence in Criminal Cases 85 (1822) (where a witness was "dead," "unable to travel," or "kept away by the means or procurement of the prisoner," Marian depositions "may be given in evidence against the prisoner"). Because the Marian statements of a deceased witness were admissible simply by virtue of the witness' death, there would have been no need to argue for their admission pursuant to a forfeiture rule.

Historical authorities also tell us that a Marian statement could not be admitted unless it was a *proper* Marian deposition, meaning that the statement was given in the presence of the defendant thereby providing an opportunity to cross-examine the witness. And this was the case whether the witness' unavailability was due to death or the "means or procurement" of the defendant. See, *e.g.,*

*ibid.* (Where a witness was "dead," "unable to travel," or "kept away by the means or procurement of the prisoner" depositions could be read but they *"must have been taken in the presence of the prisoner, so that he might have had an opportunity of cross examining the witness"* (emphasis added)); 2 W. Hawkins, Pleas of the Crown 605–606 (6th ed. 1787) (hereinafter Hawkins); Chitty, 78–80; 2 J. Bishop, New Criminal Procedure §§1194–1195, pp. 1020–1022 (2d ed. 1913) (hereinafter Bishop); *Lord Fenwick's Case*, 13 Haw., at 602. Thus, in a murder trial, where the witness was dead, either the Marian statement was proper and it came into evidence *without* the forfeiture exception; or it was improper and the forfeiture exception *could not have helped it come in.* Cf. *King* v. *Dingler*, 2 Leach 561, 563, 168 Eng. Rep. 383, 384 (1791) (a top barrister of the day argued successfully that "it is utterly impossible, unless the prisoner had been present [at the Marian deposition], that depositions thus taken can be read"). No wonder then that the majority cannot find a murder case that refers directly to the forfeiture exception. Common-law courts likely thought the forfeiture exception irrelevant in such a case.

The majority highlights two common-law murder cases that demonstrate this point—*King* v. *Woodcock* and *King* v. *Dingler*. See *ante*, at 7–9. As the majority explains, in each of these two cases, the defendant stood accused of killing his wife. In each case, the victim had given an account of the crime prior to her death. And in each case, the court refused to admit the statements (statements that might have been admitted simply by virtue of the fact that the witness had died) on the ground that they were not properly taken Marian statements, *i.e.*, not made in the presence of the defendant. Because admission pursuant to the forfeiture rule also would have required the statements to have been properly taken, there would have been no reason to argue for their admission on that basis.

Instead, in each case, the prosecution argued that the statement be admitted as a dying declaration. In *Woodcock*, depending on the account, the court either instructed the jury to consider whether the statements were made "under the apprehension of death," or determined for itself that they were and admitted them into evidence. 1 Leach, at 504, 168 Eng. Rep., at 354; see 1 E. East, Pleas of the Crown 356 (1803) (reprinted 2004). In *Dingler*, because the Crown admitted that the statements were not made "under apprehension of immediate death," the statements were excluded. 2 Leach, at 563, 168 Eng. Rep., at 384. The forfeiture rule thus had no place in *Woodcock* or *Dingler*, not because of the state of mind of the defendant when he committed his crime, but because the victim's testimony was not a properly taken Marian statement.

The American murder cases to which the majority refers provide it no more support. See *ante*, at 9 (citing *United States* v. *Woods*, 28 F. Cas. 762, 763 (CC DC 1834); *Lewis* v. *State*, 17 Miss. 115, 120 (1847); *Montgomery* v. *State*, 11 Ohio 424, 425–426 (1842); *Nelson* v. *State*, 26 Tenn. 542, 543 (1847); *Smith* v. *State*, 28 Tenn. 9, 23 (1848)). Like *Woodcock* and *Dingler*, these are dying declaration cases. While it is true that none refers to the forfeiture exception, it is also true that none of these cases involved a previously given proper Marian deposition or its equivalent.

There are other explanations as well for the absence of authority to which the majority points. The defendant's state of mind only arises as an issue in forfeiture cases where the witness has made prior statements against the defendant and where there is a possible motive for the killing other than to prevent the witness from testifying. (Where that motive is certain, for example where the defendant knows the witness only because she has previously testified against him, the prior statements would be admitted under the majority's purpose rule and the question of intent would not come up.) We can see from mod-

ern cases that this occurs almost exclusively in the domestic violence context, where a victim of the violence makes statements to the police and where it is not certain whether the defendant subsequently killed her to prevent her from testifying, to retaliate against her for making statements, or in the course of another abusive incident. But 200 years ago, it might have been seen as futile for women to hale their abusers before a Marian magistrate where they would make such a statement. See, *e.g.*, *State* v. *Rhodes*, 61 N. C. 453, 459 (1868) *(per curiam)* ("We will not inflict upon society the greater evil of raising the curtain upon domestic privacy, to punish the lesser evil of trifling violence").

I also recognize the possibility that there are too few old records available for us to draw firm conclusions. Indeed, the "continuing confusion about the very nature of the law of evidence at the end of the eighteenth century underscores how primitive and undertheorized the subject then was." See J. Langbein, The Origins of Adversary Criminal Trial 248 (2003).

Regardless, the first explanation—that the forfeiture doctrine could not have helped admit an improperly taken Marian deposition—provides a sufficient ground to conclude that the majority has found nothing in the common-law murder cases, domestic or foreign, that contradicts the traditional legal principles supporting application of the rule of forfeiture here. See Williams, Criminal Law §18, at 39 (relying on sources at common law for the proposition that the accused "necessarily intends that which must be the consequence of the act" (internal quotation marks omitted)); LaFave, Substantive Criminal Law §5.2(a), at 341 ("the traditional view is that a person who acts . . . intends a result of his act . . . when he knows that that result is practically certain to follow from his conduct, whatever his desire may be as to that result").

The majority next points to a second line of common-law

cases, cases in which a court admitted a murdered wit-
ness' "dying declaration." But those cases do not support
the majority's conclusion. A dying declaration can come
into evidence when it is "made in extremity" under a sense
of impending death, "when every hope of this world is
gone: when every motive to falsehood is silenced, and the
mind is induced by the most powerful considerations to
speak the truth." *Woodcock*, *supra*, at 502, 168 Eng. Rep.,
at 353; see *King* v. *Drummond*, 1 Leach 337, 338, 168 Eng.
Rep. 271, 272 (1784) ("[T]he mind, impressed with the
awful idea of approaching dissolution, acts under a sanc-
tion equally powerful with that which it is presumed to
feel by a solemn appeal to God upon an oath"); see also
Hawkins 619, n. 10; *Mattox* v. *United States*, 156 U. S.
237, 243–244 (1895). The majority notes that prosecutors
did not attempt to obtain admission of dying declarations
on forfeiture grounds before trying to meet these strict
"dying declaratio[n]" requirements. See *ante*, at 10. This
failure, it believes, supports its conclusion that admission
pursuant to the forfeiture exception required a showing
that the defendant killed the witness with the *purpose* of
securing the absence of that witness at trial.

There is a simpler explanation, however, for the fact
that parties did not argue forfeiture in "dying declaration"
cases. And it is the explanation I have already mentioned.
The forfeiture exception permitted admission only of a
properly taken Marian deposition. And where death was
at issue, the forfeiture exception was irrelevant. In other
words, if the Marian deposition was proper, the rule of
forfeiture was unnecessary; if the deposition was im-
proper, the rule of forfeiture was powerless to help. That
is why we find lawyers in "dying declaration" cases argu-
ing that the dying declaration was either a proper Marian
deposition (in which case it was admitted) or it was a
"dying declaration" (in which case it was admitted), or
both. See, *e.g.*, *Dingler*, *supra*, at 562, 168 Eng. Rep., at

383–384 (discussing the admission of statements either "as a deposition taken pursuant to the [Marian] statutes" or, in the alternative, "as the dying declaration of a party conscious of approaching dissolution"); *King* v. *Radbourne*, 1 Leach 457, 46–461, 168 Eng. Rep. 330, 332 (1787) (same); *People* v. *Restell*, 3 Hill 289 (N. Y. 1842) (same); see also Chitty 79–81. Under these circumstances, there would have been little reason to add the word "forfeiture."

For the same reason, we can find "dying declarations" admitted in murder cases where no proper Marian deposition existed, see, *e.g.*, *King* v. *Woodcock*, 1 Leach 500, 168 Eng. Rep. 352; 1 East, Pleas of the Crown, at 356, or in cases involving, say, wills or paternity disputes, where Marian statements were not at all at issue, see 5 J. Wigmore, Evidence §1431, p. 277, n. 2 (J. Chadbourn rev. 1974) (citing such cases from the 18th and 19th centuries). Cf. Langbein, *supra*, at 245–246, nn. 291, 292 (at common law, there existed both oath-based and cross-examination-based rationales for the hearsay rule, with the latter only becoming dominant around the turn of the 19th century (citing Gallanis, The Rise of Modern Evidence Law, 84 Iowa L. Rev. 499, 516–550 (1999))).

The upshot is that the majority fails to achieve its basic objective. It cannot show that the common law insisted upon a showing that a defendant's purpose or motive in killing a victim was to prevent the victim from testifying. At the least its authority is consistent with my own view, that the prosecution in such a case need show no more than intent (based on knowledge) to do so. And the most the majority might show is that the common law was not clear on the point.

## IV
### A

The majority makes three arguments in response. First, it says that I am wrong about unconfronted statements at

common law.   According to the majority, when courts
found wrongful procurement, they admitted a defendant's
statements without regard to whether they were con-
fronted.  See *ante*, at 15–19.  That being so, the majority's
argument goes, one must wonder why no one argued for
admissibility under the forfeiture rule in, say, *Woodcock* or
*Dingler.*   See *ante,* at 7–11.   The reason, the majority
concludes, is that the forfeiture rule would not have
helped secure admission of the (unconfronted) prior
statements in those cases, because the forfeiture rule
applied only where the defendant *purposely* got rid of the
witness.  See *ante*, at 7.  But the majority's house of cards
has no foundation; it is built on what is at most common-
law silence on the subject.  The cases it cites tell us next to
nothing about admission of unconfronted statements.

*Fenwick's Case*, see *ante,* at 16 n. 3, for example, was a
parliamentary attainder proceeding; Parliament voted to
admit unconfronted statements but it is not clear what
arguments for admission Parliament relied upon.   See
generally 13 How. St. Tr. 537.  Hence it is not clear that
Parliament admitted *unconfronted* statements pursuant to
a forfeiture theory.  In fact, the forfeiture rule in a felony
case was described in *Fenwick's Case* as applying where
the witness "hath given information against [the defen-
dant] to a proper magistrate," *id.*, at 594 (remarks of
Lovel), *i.e.*, a magistrate who normally would have had the
defendant before him as well.

*Harrison's Case*, see *ante,* at 15–16, did admit an uncon-
fronted statement, but it was a statement made before a
*coroner.*   See 12 How. St. Tr., at 852.   Coroner's state-
ments seem to have had special status that may some-
times have permitted the admission of prior unconfronted
testimonial statements despite lack of cross-examination.
But, if so, that special status failed to survive the Atlantic
voyage.  See *Crawford*, 541 U. S., at 47, n. 2 (early Ameri-
can authorities "flatly rejected any special status for coro-

ner statements").

The American case upon which the majority primarily relies, *Rex* v. *Barber*, 1 Root 76 (Conn. Super. Ct. 1775), see *ante*, at 16, consists of three sentences that refer to "[o]ne White, who had testified before the justice and before the grand-jury against Barber." 1 Root, at 76. White was "sent away" at Barber's "instigation" and the "court admitted witnesses to relate what White had before testified." *Ibid.* I cannot tell from the case whether White's statement was made before a grand jury or was taken before a justice where cross-examination would have been possible. At least some commentators seem to think the latter. See W. Best, The Principles of the Law of Evidence 467, 473, n. (*e*) (American ed. 1883) (listing *Barber* as a case "of preliminary investigation before a magistrate" where "evidence ha[d] been admitted, there having been a right of cross-examination"); 2 Bishop, §§1194–1197, at 1020–1024 (explaining that where a witness had been "kept out of the way" by the defendant, his prior testimony is admissible "if the defendant had the opportunity to cross-examine the witness against him, not otherwise," and giving as a "[f]amiliar illustration" of this principle cases before a committing magistrate including *Barber*); J. Stephen, A Digest of the Law of Evidence 161, American Note, General (1902) (citing *Barber* for the proposition that evidence at a preliminary hearing was admissible "if the party against whom it is offered was present).

The majority's final authority, *Williams* v. *State*, 19 Ga. 403 (1856), see *ante*, at 17, involved the admission of an "examination" taken by "the committing magistrate." Such examinations were ordinarily given in the presence of the defendant. See R. Greene & J. Lumpkin, Georgia Justice 99 (1835) (describing procedures relevant to a magistrate's examination of a witness in Georgia); see also M. M'Kinney, The American Magistrate and Civil Officer 235 (1850) (testimony of the accuser and his witnesses

taken by a magistrate "must be done in the presence of the party accused, in order that he may have the advantage of cross-examining the witnesses").

At the same time, every Supreme Court case to apply the forfeiture rule has done so in the context of previously confronted testimony. See, *e.g.*, *Reynolds*, 98 U. S., at 158 (admitting previously confronted statements pursuant to a forfeiture rule); *Diaz*, 223 U. S., at 449 (same); *Mattox*, 156 U. S., at 240 (same); *Motes*, 178 U. S., at 470–471 (same).

Of course, modern courts have changed the ancient common-law forfeiture rule—in my view, for the better. They now admit unconfronted prior testimonial statements pursuant to such a rule. See, *e.g.*, *United States* v. *Carlson*, 547 F. 2d 1346, 1357–1360 (CA8 1976) (the earliest case to do so); *United States* v. *Mastrangelo*, 693 F. 2d 269 (CA2 1982); *United States* v. *Rouco*, 765 F. 2d 983 (CA11 1985); see also *Davis*, 547 U. S., at 834. But, as the dates of these cases indicate, the admission of unconfronted statements under a forfeiture exception is a fairly recent evidentiary development. The majority evidently finds this elephant of a change acceptable—as do I. Without it, there would be no meaningful modern-day forfeiture exception. Why then does the majority strain so hard at what, comparatively speaking, is a gnat (and a nonexistent gnat at that)?

In sum, I have tried to show the weakness of the foundation upon which the majority erects its claim that the common law applied the forfeiture rule only where it was a defendant's *purpose* or *motive* (not his *intent* based on knowledge) to keep the witness away. The majority says that "the most natural reading of the language used at common law" supports its view. *Ante*, at 14. As I have shown, that is not so. See *supra*, at 3–4. The majority next points to "the absence of common-law cases *admitting* prior statements on a forfeiture theory" where the defendant prevented, but did not *purposely* prevent, the witness

from testifying. *Ante*, at 14. As I have pointed out, this absence proves nothing because (1) the relevant circumstances (there has been a prior testimonial statement, the witness is now unavailable due to defendant's actions, and the defendant knows that the witness will not testify but that is not his purpose) are likely to arise almost exclusively when the defendant murders the witness, and (2) a forfeiture theory was ordinarily redundant or useless in such cases. See *supra*, at 14–15. The majority, describing its next argument as "conclusive," points to "innumerable cases" where courts did not admit "unconfronted inculpatory testimony by murder victims" against a defendant. *Ante*, at 14–15. The majority is referring to those dying declaration cases in which unconfronted statements were not admitted because the witness was not sufficiently aware of his impending death when he made them. See *ante*, at 9. But as I have explained, the forfeiture rule would have been unhelpful under these circumstances. See *supra*, at 18. Finally, the majority points to a "subsequent history" in the United States where questions about the defendant's state of mind did not begin to arise until the 1980's. *Ante*, at 14. I have explained why that history does not support its view. See *supra*, at 22. Having only begun to swallow the elephant in the late 1970's and early 1980's, it makes sense that courts would not have previously considered the gnat.

While I have set forth what I believe is the better reading of the common-law cases, I recognize that different modern judges might read that handful of cases differently. All the more reason then *not* to reach firm conclusions about the precise metes and bounds of a contemporary forfeiture exception by trying to guess the state of mind of 18th century lawyers when they decided *not* to make a particular argument, *i.e.*, forfeiture, in a reported case. That is why, in Part II, *supra,* I have set forth other, more conclusive reasons in support of the way I would

read the exception.

Second, the majority objects to that aspect of the forfeiture rule that requires a judge to make a preliminary assessment of the defendant's wrongful act in order to determine whether the relevant statements should be admitted. See *ante*, at 23. But *any* forfeiture rule requires a judge to determine as a preliminary matter that the defendant's own wrongdoing caused the witness to be absent. Regardless, preliminary judicial determinations are not, as the majority puts it "akin . . . to 'dispensing with jury trial.'" *Ante,* at 11. (quoting *Crawford,* 541 U. S., at 62). We have previously said that courts may make preliminary findings of this kind. For example, where a defendant is charged with conspiracy, the judge is permitted to make an initial finding that the conspiracy existed so as to determine whether a statement can be admitted under the co-conspirator exception to the hearsay rule. See *Bourjaily* v. *United States*, 483 U. S. 171, 175–176 (1987) ("The inquiry made by a court concerned with these matters is not whether the proponent of the evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied"). And even the plurality is forced to admit that it is "sometimes" necessary for "judge . . . to inquire into guilt of the charged offense in order to make a preliminary evidentiary ruling." *Ante*, at 21, n. 6.

Third, the plurality seems to believe that an ordinary intent requirement, rather than a purpose or motive requirement, would let in too much out-of-court testimonial evidence. See *ante*, at 20–22. Ordinarily a murderer would know that his victim would not be able to testify at a murder trial. Hence all of the victim's prior testimonial statements would come in at trial for use against a defendant. To insist upon a showing of purpose rather than plain (knowledge-based) intent would limit the amount of unconfronted evidence that the jury might hear.

This argument fails to account for the fact that overcoming a constitutional objection does not guarantee admissibility of the testimonial evidence at issue. The States will still control admissibility through hearsay rules and exceptions. And why not? What important constitutional interest is served, say, where a prior testimonial statement of a victim of abuse is at issue, by a constitutional rule that lets that evidence in if the defendant killed a victim *purposely* to stop her from testifying, but keeps it out if the defendant killed her *knowing* she could no longer testify while acting out of anger or revenge?

## B

Even the majority appears to recognize the problem with its "purpose" requirement, for it ends its opinion by creating a kind of presumption that will transform *purpose* into *knowledge-based intent*—at least where domestic violence is at issue; and that is the area where the problem is most likely to arise.

JUSTICE SOUTER, concurring in part, says:

> "[The requisite] element of intention would normally be satisfied by the intent inferred on the part of the domestic abuser in the classic abusive relationship, which is meant to isolate the victim from outside help, including the aid of law enforcement and the judicial process. If the evidence for admissibility shows a continuing relationship of this sort, it would make no sense to suggest that the oppressing defendant miraculously abandoned the dynamics of abuse the instant before he killed his victim, say in a fit of anger." *Ante,* at 3.

This seems to say that a showing of domestic abuse is sufficient to call into play the protection of the forfeiture rule in a trial for murder of the domestic abuse victim. Doing so when, in fact, the abuser may have had other

matters in mind apart from preventing the witness from testifying, is in effect not to insist upon a showing of "purpose." Consequently, I agree with this formulation, though I would apply a simple intent requirement across the board.

V

The rule of forfeiture is implicated primarily where domestic abuse is at issue. In such a case, a murder victim may have previously given a testimonial statement, say, to the police, about an abuser's attacks; and introduction of that statement may be at issue in a later trial for the abuser's subsequent murder of the victim. This is not an uncommon occurrence. Each year, domestic violence results in more than 1,500 deaths and more than 2 million injuries; it accounts for a substantial portion of all homicides; it typically involves a history of repeated violence; and it is difficult to prove in court because the victim is generally reluctant or unable to testify. See Bureau of Justice Statistics, Homicide trends in the U. S., http://www.ojp.usdoj.gov/bjs/homicide/tables/relationshipt ab.htm (as visited June 23, 2008, and available in Clerk of Court's case file); Dept. of Health and Human Services, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Costs of Intimate Partner Violence Against Women in the United States 19 (2003); N. Websdale, Understanding Domestic Homicide 207 (1999); Lininger, Prosecuting Batterers after *Crawford*, 91 Va. L. Rev. 747, 751, 768–769 (2005).

Regardless of a defendant's purpose, threats, further violence, and ultimately murder, can stop victims from testifying. See *id.,* at 769 (citing finding that batterers threaten retaliatory violence in as many as half of all cases, and 30 percent of batterers assault their victims again during the prosecution). A *constitutional* evidentiary requirement that insists upon a showing of purpose

(rather than simply intent or probabilistic knowledge) may permit the domestic partner who made the threats, caused the violence, or even murdered the victim to avoid conviction for earlier crimes by taking advantage of later ones.

In *Davis,* we recognized that "domestic violence" cases are "notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial." 547 U. S., at 832–833. We noted the concern that "[w]hen this occurs, the Confrontation Clause gives the criminal a windfall." *Id.*, at 833. And we replied to that concern by stating that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Ibid.* To the extent that it insists upon an additional showing of purpose, the Court breaks the promise implicit in those words and, in doing so, grants the defendant not fair treatment, but a windfall. I can find no history, no underlying purpose, no administrative consideration, and no constitutional principle that requires this result.

Insofar as JUSTICE SOUTER's rule in effect presumes "purpose" based on no more than evidence of a history of domestic violence, I agree with it. In all other respects, however, I must respectfully dissent.